[Civ. No. 12167, Third Dist. July 9, 1970.]

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Plaintiff, Cross-defendant and Respondent, v.
ALLSTATE INSURANCE COMPANY et al.,
Defendants, Cross-complainants and Appellants;
HOWARD T. ALSBURY et al., Defendants, Cross-defendants and Respondents;
DEAN R. WIEMKEN et al., Defendants, Cross-complainants and Respondents;
JACK D. ROSE, Cross-defendant and Respondent.

510

512

## COUNSEL

McDonald & Donahue, James E. Donahue, Eugene W. Saeltzer, Douglas B. McDonald, Cyril Viadro, Johnson, Davies & Greve and Claire Greve for Defendants, Cross-complainants and Appellants.

Rich, Fuidge, Dawson, Marsh & Morris and Charles Dawson for Plaintiff, Cross-defendant and Respondent.

Carlton & Asbill, Daniel Carlton, Carlton and Borchard, Gary C. Borchard, Fitzwilliam, Memering, Stumbos & DeMers, T. D. Bolling, Rust, Hoffman & Mills and John S. Gilmore for Defendants, Cross-defendants and Respondents.

James F. Perley and Jere E. Hurley, Jr., for Defendants, Cross-complainants and Respondents.

No appearance for Cross-defendant and Respondent.

## OPINION

**FRIEDMAN, Acting P. J.**—This is an appeal from a declaratory judgment determining the obligations of five insurance companies for the payment

of personal injury judgments against Dean Wiemken. Another phase of the appeal involves an award of damages for breach of an insurer's obligation to defend.

In December 1965 Wiemken was the operator of a Christmas tree lot in Fremont, Alameda County. Wiemken's employee, Rose, was driving Wiemken's 1955, one and one-half ton Dodge truck in Shasta County and collided with an automobile, injuring the latter's two occupants, Alsbury and Faucett. The two injured men sued Wiemken and Rose. Alsbury was awarded damages of $40,000 and Faucett $110,000.

At the time of the accident Wiemken had the following casualty insurance policies:

(1) An automobile policy issued by Allstate Insurance Company with a limit of $100,000/$300,000, specifically covering a 1955 Chevrolet pickup truck, a 1965 Pontiac sedan, a 1957 Ford convertible, plus several defined classes of vehicles, including *temporary substitute automobile.*

(2) An automobile policy issued by St. Paul-Mercury Insurance Company with a limit of $50,000/$100,000, covering a 1959 Ford station wagon.

(3) A comprehensive liability policy[1] with a limit of $300,000 issued by Pacific Indemnity Company, designating Wiemken's Christmas tree lot (including *the ways immediately adjoining*) as the premises and covering *the ownership, maintenance or use of the premises, and all operations necessary or incidental thereto.*

(4) A homeowner's liability policy issued by American Motorists Insurance Company with a $25,000 limit.

A fifth insurer, State Farm Mutual Automobile Insurance Company, is involved because of liability policies it had issued to Rose's father. Rose was apparently a minor at the time of the accident and a resident of his father's household. The father had the following State Farm policies:

(1) A homeowner's liability policy with a limit of $10,000/$20,000.

(2) Three separate automobile liability policies, each for a designated vehicle.

A bizarre twist imparted an impetus to the liability proceedings following the accident. Be it remembered that one of Wiemken's three vehicles designated in the Allstate policy was a 1955 Chevrolet pickup truck.

---

[1] This policy was entitled "Owners', Landlords' and Tenants' Liability Policy."

Wiemken was using the 1955 Chevrolet around his Christmas tree lot, but the vehicle developed a knock which worsened until Wiemken feared it would "throw a rod." Because of the Chevrolet's condition he bought the 1955 Dodge truck on November 25, 1965. When he learned from the Department of Motor Vehicles that the annual registration fee would not be prorated over the remainder of 1965, he did not register the truck. Instead, he removed the license plates and registration slip from the 1955 Chevrolet pickup and put them on the 1955 Dodge truck. Wiemken did not inform Allstate that he had acquired the Dodge truck, believing that under his policy he had 30 days to do so. The collision occurred on December 9, 1965, while Rose was enroute through Shasta County to pick up Christmas trees.

The day after the accident Wiemkin notified Allstate that the 1955 Dodge truck he had bought on November 25 was involved in an accident. After an investigation, beclouded by the switch of license plates, Allstate on February 23, 1966, mailed a disclaimer of coverage and did nothing more by way of investigation or defense. Alsbury and Faucett filed their personal injury suits in Shasta County. Wiemken engaged an attorney to defend his interests.

Although State Farm Mutual denied coverage of Rose, it did undertake to defend him in the Alsbury-Faucett lawsuits. In January 1967, while Alsbury-Faucett damage actions were awaiting trial, State Farm instituted the present declaratory relief action, naming Allstate and a number of Does as defendants. In April 1967 Wiemken's attorney requested Pacific Indemnity to defend Wiemken in the personal injury actions. Pacific Indemnity accepted the tender of defense, subject to a reservation of the right to disclaim coverage. The damage actions were tried together in May 1967 and resulted in the judgments against Wiemken and Rose.

The other insurance carriers appeared in this declaratory relief action. Wiemken too entered the lawsuit, seeking general damages, legal fees and costs, premised upon allegedly wrongful disclaimers of defense. The two judgment creditors, Alsbury and Faucett, filed pleadings, seeking to fasten various of the insurers with liability. The trial court ruled that the 1955 Dodge truck was a *temporary substitute automobile* covered by the Allstate policy; held that both Allstate and Pacific Indemnity were obligated to defend Wiemken and to indemnify him; declared that both were liable to pay the Alsbury-Faucett judgments; found that Allstate's refusal to defend Wiemken had been unjustified; gave Wiemken compensatory damages against Allstate; exonerated the other insurance carriers. Both Allstate and Pacific Indemnity appeal.

## PACIFIC INDEMNITY'S LIABILITY

■ Under the so-called *"Wildman* doctrine" all applicable statutes become incorporated in insurance policies, including statutory extension of automobile insurance coverage to the continental United States. (Veh. Code, § 16451; *Wildman* v. *Government Emp. Ins. Co.* (1957) 48 Cal.2d 31 [307 P.2d 359].) At the time of the trial court's decision California case law—particularly *Pacific Employers Ins. Co.* v. *Maryland Casualty Co.* (1966) 65 Cal.2d 318 [54 Cal.Rptr. 385, 419 P.2d 641]—lent support to the proposition that a comprehensive liability policy covering automobile-related accidents on the insured's premises and *the ways immediately adjoining* was perforce transformed into a vehicle liability policy. In that state of the law the trial court concluded that the Alsbury-Faucett judgments were within the coverage of Wiemken's general liability policy issued by Pacific Indemnity Company.

During the pendency of this appeal, the Supreme Court filed its decisions in *Herzog* v. *National American Ins. Co.* (1970) 2 Cal.3d 192 [84 Cal.Rptr. 705, 465 P.2d 841], and *Huggins* v. *Yoshiwara* (1970) 2 Cal.3d 200 [84 Cal.Rptr. 709, 465 P.2d 845]. The parties have submitted supplemental briefs in the light of these two decisions. Generally, these decisions hold that a homeowner's general liability policy covering automobile-related accidents on the insured's premises and *the ways immediately adjoining* does not thereby become an automobile liability policy mandatorily extended to cover the continental United States; that the phrase *ways immediately adjoining* is not so ambiguous as to defy reasonable construction in the context of a particular case; that in the cases before the Supreme Court the homeowners' policies were to be interpreted to exclude automobile accidents on highways miles away from the premises of the insured.

The Owners', Landlords' and Tenants' Liability Policy issued by Pacific Indemnity Company provided bodily injury liability coverage for a hazard designated as *Division 1—Premises—Operations. The ownership, maintenance or use of the premises, and all operations necessary or incidental thereto.* The address of the Christmas tree lot was given as the location of the premises, which were defined to include *the ways immediately adjoining.* The policy listed various exclusions, among them the operation or use of automobiles *if the accident occurs away from the premises.* The premium was $15 for the period November 23, 1965, to January 1, 1966.

■ In determining whether the Pacific Indemnity policy became an automobile liability policy subject to the *Wildman* doctrine, the court

must take cognizance of the parties' reasonable expectations in entering into the agreement. (*Herzog* v. *National American Ins. Co., supra,* 2 Cal.3d at p. 197.) The policy is to be considered as an entirety, each clause lending meaning to the other. (*Jurd* v. *Pacific Indem. Co.* (1962) 57 Cal.2d 699, 704 [21 Cal.Rptr. 793, 371 P.2d 569].) ■ According to its general tenor, the policy was designed to provide "on premise" comprehensive liability coverage. True, the hazard was defined to include *all operations necessary or incidental* to the use of the premise. This relatively broad reference to the kind of covered activity was accompanied by two limitations as to the location of the covered activity: the circumscription to the *ways immediately adjoining* the premises and the express exclusion of automobile-connected accidents *away from the premises.* ■ Policy limitations which run counter to the policyholder's reasonable expectations must be "conspicuous, plain and clear" and are construed against the carrier. (*Paramount Properties Co.* v. *Transamerica Title Ins. Co.* (1970) 1 Cal.3d 562, 569 [83 Cal.Rptr. 394, 463 P.2d 746].) ■ Here the limitations paralleled and did not defeat the policyholder's reasonable expectations, as manifested by a designated business location as the focal area of coverage and by the relatively small premium. Such a policyholder would be quite aware of the necessity for buying other insurance covering vehicle accidents on the highways. A fair interpretation of the Pacific Indemnity policy impels the conclusion that the accident in Shasta County, several hundred miles from the Christmas tree sales lot, was not covered.[2]

### ALLSTATE'S INDEMNITY LIABILITY

Allstate's claim to noncoverage is grounded on the assertion that the 1955 Dodge flatbed truck was not a temporary substitute automobile in relation to the 1955 Chevrolet pickup truck designated in the policy. The policy defines a temporary substitute automobile as follows: *d) "temporary substitute automobile" means any automobile, including a trailer, while temporarily used as a substitute for the owned automobile or trailer when withdrawn from normal use because of its breakdown, repair, servicing, loss or destruction.*

---

[2]The parties claiming coverage by Pacific Indemnity point to Insurance Code section 11580.1, subdivision (g), enacted in 1968. Generally, subdivision (g) provides that a homeowner's policy is not an automobile policy for the purposes of the financial responsibility provisions of the Vehicle Code. The argument is thus made that the Legislature recognized a distinction between homeowners' and business premises liability policies, not intending to affect the latter's court-imposed status as automobile liability insurance. Despite the difference in legislative treatment, the latter policies are nevertheless to be construed according to their fair import. Apparently the Legislature was reaching the homeowners' policies because only they presented a problem in the administration of the financial responsibility law.

The trial court found that the 1955 Chevrolet pickup had broken down; that at the time of the accident the 1955 Dodge flatbed was being used temporarily as a substitute for it. Allstate urges a lack of evidence that the Dodge was being used temporarily as a substitute; to the contrary, it contends that the Dodge would have been used to pick up the Christmas trees whether the Chevrolet was operational or not.

■ A clause extending coverage to a substitute automobile is for the insured's benefit; if any construction is necessary, it is to be construed liberally in favor of the insured. Its purpose is not to limit narrowly or defeat coverage, but to make the coverage reasonably definite as to the vehicle normally used, while permitting the insured to continue driving should that vehicle be temporarily out of commission. (*Allstate Ins. Co.* v. *Roberts* (1958) 156 Cal.App.2d 755, 758 [320 P.2d 90]; see Note, 34 A.L.R.2d 936-951.)

■ There were inconsistencies in the evidence covering the condition of the 1955 Chevrolet and the circumstances of the Dodge's use.[3] Conflicting inferences were available. Thus the familiar substantial evidence rule holds sway; all reasonable inferences must be drawn to uphold the findings. (*Clark* v. *Gibbons* (1967) 66 Cal.2d 399, 402 [58 Cal.Rptr. 125, 426 P.2d 525].)

Contrary to Allstate's contention, there is substantial evidence to support the trial court's inference. Wiemken was an experienced automobile mechanic. When the Chevrolet commenced to give trouble, he decided to lay it up until the Christmas tree sales season ended, when he would have time to repair it. He bought the Dodge truck not only to use in the seasonal Christmas tree venture, but for hauling afterward. Relative to the trees to be brought to the lot, he had purchased too many to be carried in one trip. Rose had brought down one load in the Dodge and was enroute to pick up a second load when the accident happened. Asked

[3]Wiemken testified that near the end of January he conferred with Allstate's claims agent and informed him that the Dodge was in use at the time of the accident because the Chevrolet pickup "had a connecting rod out and couldn't go that far." Several weeks later, on February 16, 1966, Wiemken was requested to sign and did sign a handwritten statement prepared and written by the claims agent, which included a declaration that all three of the covered vehicles were "operational & in good operating condition." After the claims agent left, Wiemken telephoned him and told him that he (the claims agent) knew that the statement relative to the Chevrolet's operating condition was untrue. He testified that the claims agent told him that the matter was not very important and didn't make any difference. The claims agent denied this testimony. The claims agent testified that the signed statement declaring the operational condition of the three vehicles "would be sufficient to rule out the temporary substitute."

whether the remaining trees could have been carried in one load in the Chevrolet pickup, Wiemken testified that it was "hard to say," that there might have been an overage, but the remainder of the trees would certainly have weighed less than one and one-half tons. He testified that the Dodge was being used around the tree sales operation for many of the purposes which the Chevrolet would have fulfilled. In January, after the shutdown of the Christmas tree business, he repaired the Chevrolet and made it operable.

■ Unlike many of the clauses involved in the substitute automobile decisions, the Allstate clause did not exclude an owned or newly acquired vehicle from status as a temporary substitute. (Cf. 34 A.L.R.2d at p. 949; 7 Appleman, Insurance Law and Practice (1962) § 4293.5.) The newly acquired Dodge was being used as either a temporary or a permanent replacement. In relationship to the circumstances (i.e., the temporary disability of the Chevrolet, that disability as the motivation for purchase and use of the Dodge, the brief time between its acquisition and the collision) the policy provision took on an ambiguity to be resolved against the carrier. During the immobilization of the Chevrolet, the insurer's risk was confined to the number of vehicles for which it had received a premium payment. The circumstances reasonably justified the trial court's inference that the Dodge had not become a permanent replacement for the Chevrolet at the time of the accident, but was in temporary use as a substitute vehicle.

### INDEMNITY LIABILITY OF OTHER COMPANIES

In this case the multiple contentions of the parties underwent a continual flux, influenced by the ebb and flow of current decisional developments. Supplemental briefs filed here after the Court of Appeal decisions in the *Herzog* and *Huggins* cases[4] were largely superseded in later briefs filed with us after the Supreme Court decisions in those actions. Another decision filed during the pendency of this appeal, *Mid-Century Ins. Co.* v. *Hernandez* (1969) 275 Cal.App.2d 839 [80 Cal.Rptr. 448], also caused shifts of position. In general, shifting case law diminished the potential availability of the various comprehensive policies and augmented the litigants' interest in several automobile policies which had not received much

[4]*Herzog* v. *National American Ins. Co.,* (Cal.App.) 79 Cal.Rptr. 273, hg. granted; *Huggins* v. *Yoshiwara,* (Cal.App.) 79 Cal.Rptr. 681, hg. granted.

attention in the trial court, namely: (1) the automobile liability policy issued to Wiemken by St. Paul-Mercury, designating a 1959 Ford station wagon as the insured vehicle, and (2) the three State Farm automobile policies held by Rose's father, each designating a particular vehicle.

The trial court exonerated American Motorists Insurance Company, which had issued a homeowner's liability policy to Wiemken. Although at one stage Pacific Indemnity had asserted participatory liability on the part of American Motorists, that assertion has apparently been dropped in view of the *Herzog-Huggins* decisions. The homeowner's policy issued by by American Motorists had coverage features approximating those of the policies considered in *Herzog* and *Huggins*. The same result follows—no coverage.

At one point, several of the parties had eyed the State Farm homeowner's policy issued to Rose's father as a potential resource. That policy too approximated the coverage provisions considered in *Huggins* and *Herzog*. The same result follows—no coverage.

The trial court ruled that Wiemken's automobile policy issued by St. Paul-Mercury did not cover the accident, since the policy defined the owned vehicle to include vehicles up to three-quarter ton capacity and excluded owned vehicles from the category of temporary substitute automobiles. Similarly, State Farm was exonerated, since the policies held by Rose, Sr., excluded non-owned vehicles used in business and non-owned vehicles with more than four wheels. (The Wiemken Dodge truck driven by Rose, Jr., was a six-wheel vehicle.)

It is now contended that the restrictions on coverage in the St. Paul-Mercury and State Farm policies violate California public policy, as expressed in Vehicle Code sections 16451 and 16452[5]; that, under the

---

[5]Vehicle Code section 16451: "An owner's policy of motor vehicle liability insurance shall insure the person named therein and any other person, as insured, using any owned motor vehicle with the express or implied permission of said assured, against loss from the liability imposed by law for damages arising out of ownership, maintenance, or use of such motor vehicle within the continental limits of the United States to the extent and aggregate amount, exclusive of interest and costs, with respect to each motor vehicle, of fifteen thousand dollars ($15,000) for bodily injury to or death of each person as a result of any one accident and, subject to said limit as to one person, the amount of thirty thousand dollars ($30,000) for bodily injury to or death of all persons as a result of any one accident and, the amount of five thousand dollars ($5,000) for damage to property of others as a result of any one accident."

Vehicle Code section 16452: "An operator's policy of motor vehicle liability insurance shall insure the person named as insured therein against loss from the liability

doctrine of *Wildman* v. *Government Emp. Ins. Co., supra,* the coverage demands of these statutes are written into these policies by force of law. Thus, notwithstanding St. Paul-Mercury's designation of a 1959 Ford station wagon and any non-owned temporary substitute as the covered vehicle, section 16451 would extend coverage to Rose when he drove any owned vehicle with the permission of Wiemken, the named insured. Similarly, since Rose was a resident of his father's household, section 16452 could conceivably extend the father's State Farm policies to cover the son while driving any non-owned vehicle. Basis of these contentions is *Mid-Century Ins. Co.* v. *Hernandez, supra.*

In *Mid-Century* the court declared that state public policy, as expressed in Insurance Code section 11580.1 and Vehicle Code sections 16451-16452, establishes the following demands: "Any owner's motor vehicle liability policy governed by California law must provide coverage for the vehicle therein described no matter who operates it, so long as that operation is within the continental United States and with the consent of the named insured, unless, by an endorsement conforming to subdivision (e) of Insurance Code section 11580.1, some particular person is expressly excluded. Any operator's policy must provide coverage for the named insured for any non-owned motor vehicle that he operates, whether therein described or not, so long as the operation is within the continental United States. Any attempt by an insurance company to limit its required coverage is void and ineffective." (275 Cal.App.2d at p. 844.)

A decision paralleling *Mid-Century* is *Abbott* v. *Interinsurance Exchange* (1968) 260 Cal.App.2d 528 [67 Cal.Rptr. 220], which nullified a policy clause excluding permissive driving by a named driver. (Cf. Ins. Code, § 11580.1, subd. (e).)

This court respectfully disagrees with both the *Mid-Century* and *Abbott* decisions, although both rest upon the seeming authority of *Wildman* v. *Government Emp. Ins. Co.* (1957) *supra,* 48 Cal.2d 31; *American Auto. Ins. Co.* v. *Republic Indem. Co.* (1959) 52 Cal.2d 507 [341 P.2d 675]; *Jurd* v. *Pacific Indem. Co.* (1962) *supra,* 57 Cal.2d 699; *Interinsurance Exchange etc. Southern Cal.* v. *Ohio Cas. Ins. Co.* (1962) 58 Cal.2d 142 [23 Cal.Rptr. 592, 373 P.2d 640]; *Atlantic Nat. Ins. Co.* v. *Armstrong*

imposed on him by law for damages arising out of use by him of any motor vehicle not owned by him, and for any subsequently acquired motor vehicle for a period not to exceed 10 days from date of purchase, within the same territorial limits and subject to the same limits of liability as are set forth above with respect to an owner's policy of liability insurance."

(1966) 65 Cal.2d 100 [59 Cal.Rptr. 569, 416 P.2d 801]; *Pacific Employers Ins. Co.* v. *Maryland Casualty Co.* (1966) *supra,* 65 Cal.2d 318, as well as a number of intermediate appellate decisions. (Many of the latter are cited in the *Abbott* opinion.) None of these cases, with the exception of *Abbott,* considers the impact of the 1963 legislation which added section 11580.1 to the Insurance Code[6] and amended several provisions of the Vehicle Code.

■ One starts with the basic proposition, enunciated in *Wildman,* that statutes demanding coverage cannot be defeated by restrictive clauses and therefore become an implicit part of every affected insurance policy. After acceptance of that proposition, the next inquiry is—which statutes?

California had adopted a form of financial responsibility legislation in 1929, calling upon a driver to post proof of ability to respond in damages *after an accident.* (Stats. 1929, ch. 259.) One form of proof was the certificate of an insurance carrier that it had issued to the driver a vehicle liability policy containing coverage provisions specified by the statute. In 1935 this legislation was codified as Vehicle Code sections 410 through 416. (Stats. 1935, ch. 27.) One of the codified provisions was section 415, which specified just what kind of motor vehicle liability policy could be certified in satisfaction of these requirements (which arose after an acci-

---

[6]Insurance Code section 11580.1 provides in part: "No policy of automobile liability insurance as provided in Section 16057 of the Vehicle Code covering liability arising out of the ownership, maintenance or use of any motor vehicle shall be issued or delivered in this state to the owner of a motor vehicle, or shall be issued or delivered by any insurer licensed in this state, upon any motor vehicle then principally garaged or principally used in this state unless it contains the following provisions:

"(a) Provision with coverage limits at least equal to the financial responsibility requirements specified in Section 16059 of the Vehicle Code.

"(b) Provision designating by explicit description or by appropriate reference all motor vehicles with respect to which coverage is intended to be granted.

"(c) Provision designating by explicit description the purposes of use of such motor vehicles with respect to which coverage is not intended to be granted.

"(d) Provision insuring the insured name therein and to the same extent that coverage is afforded such named insured in respect to said described motor vehicles, any other person using, or legally responsible for the use of, said motor vehicles, provided the motor vehicles are being used by the named insured or with his permission, express or implied.

"(e) Notwithstanding the foregoing subdivisions or the provisions of Article 2 (commencing with Section 16450), Chapter 3, Division 7, or Article 2 (commencing with Section 17150), Chapter 1, Division 9, of the Vehicle Code, the insurer and any named insured may, by the terms of such policy or by a separate writing, agree that coverage under the policy shall not apply, nor accrue to the benefit of the insured or any third party claimant, while said motor vehicles are being used by a natural person or persons designated by name. Such agreement by any named insured shall be binding upon every insured to whom such policy applies and upon every third party claimant.

" . . . . . . . . . . . ."

dent.[7]) Among the coverage provisions required by section 415 was the "omnibus clause" requiring the policy to insure not only the policyholder but any person using the insured vehicle with his consent. In that state of the law, *Wildman* held, in effect, that the omnibus coverage provision of section 415 became an implicit condition of all automobile liability policies written in California—not only those posted as proof of financial responsibility after an accident, but all automobile liability policies.

The pre-1935 financial responsibility legislation had referred to two kinds of insurance, one covering the policyholder against liability arising from the operation of his own vehicle, the other against his liability for operating a vehicle not his own. In offering the 1935 codification, the California Code Commission confessed a degree of perplexity as to whether the Legislature intended a vehicle owner to post one kind or both kinds of policy. (See Code Commissioners' Note following Veh. Code, § 16430 in annotated editions of Vehicle Code.) A 1957 amendment to section 415 (Stats. 1957, ch. 1654) clarified the matter, specifically recognizing one kind of insurance called *owner's policy* and another called *operator's policy*. The differentiation has significance in the appraisal of legislative objectives. A person fastened with a judgment for damages *after an accident* might be restored to the privilege of driving non-owned vehicles by posting an operator's policy as proof of financial responsibility. The provision for an operator's policy emphasizes the statutory design to fix insurance prerequisites arising after an accident.[8]

In 1959 a recodification of the Vehicle Code occurred (Stats. 1959, ch. 3). Section 16431 now provided for proof of financial responsibility in the form of an insurance company's certification that it had issued a policy fulfilling the definition of *motor vehicle liability policy*. That definition and the accompanying coverage demands had been contained in former section 415, which was now broken up and distributed among sections

---

[7]Anent the statutory objective of specifying insurance coverage in a policy to be issued as proof of financial responsibility after an accident, a comment in 1 Stanford Law Review 263, 264 (1949) declares: "The basic assumption of the law is that an accident resulting in a judgment establishes the likelihood that the judgment debtor will have future accidents. The law is designed to encourage the debtor to pay judgments arising from his first accident and to assure his ability to respond in damages for any future accidents."

Another commentator speaks of the amendment of the legislation to establish proof of *future financial responsibility*. (Note, *California Financial Responsibility Laws—a Judicial Interpretation* (1969) 20 Hastings L.Rev. 1273.)

[8]*Wisdom* v. *Eagle Star Ins. Co.* (1963) 211 Cal.App.2d 602, 604-605 [27 Cal.Rptr. 599], illustrates the judicial perplexity ensuing when status as an *operator's policy* is ascribed to a public liability policy issued without reference to the financial responsibility legislation.

16450 through 16455. Section 16451 now stated the coverage requisites of an owner's policy, section 16452 of an operator's policy. These policy specifications would fulfill the requisites for certification under section 16431.

Nevertheless, Supreme Court decisions during the year 1962, *Jurd* v. *Pacific Indem. Co., supra,* and *Interinsurance Exchange etc. Southern Cal.* v. *Ohio Cas. Ins. Co., supra,* reiterated not only the *Wildman* principle, but also its specific holding that former section 415 was *sub silentio* incorporated in *all* motor vehicle liability policies, not alone those posted as proof of financial responsibility after an accident.

All these decisions were motivated by a judicial desire to give " 'monetary protection to that ever changing and tragically large group of persons who while lawfully using the highways themselves suffer grave injury through the negligent use of those highways by others.' " (*Interinsurance Exchange etc. Southern Cal.* v. *Ohio Cas. Ins. Co., supra,* 58 Cal.2d at p. 153, quoting *Continental Cas. Co.* v. *Phoenix Constr. Co.* (1956) 46 Cal.2d 423, 434 [296 P.2d 801, 57 A.L.R.2d 914].) None of them expressed recognition of the fact that California legislation permits one uninsured accident, that is, the financial responsibility law comes into play only *after* an accident. All these decisions injected the financial responsibility law's insurance demands into policies issued *before* the accident.

Inferably, this judicial disregard of the limited purpose of the financial responsibility law was troublesome to the insurance industry and the Legislature. At any rate, the 1963 Legislature enacted chapter 1259 of that year's session laws, adding section 11580.1 to the Insurance Code (fn. 6, *supra*) and amending Vehicle Code section 16450.[9] On its face section 11580.1 was a comprehensive enumeration of mandatory and permissible features to be contained in automobile liability insurance policies to be "issued or delivered in this state." This enumeration duplicated in part, in part diverged from, the demands voiced by the financial responsibility provisions, Vehicle Code sections 16450 and 16451. Subdivisions (b) and (d) of the former permitted an explicit designation of the covered vehicle while the financial responsibility law (16451) seemingly demanded coverage of any owned vehicle. Subdivision (c) of the former permitted use

---

[9] The 1963 amendment added the last sentence to section 16450, Vehicle Code, which now provides as follows: "A 'motor vehicle liability policy,' as used in Chapters 2, 3 and 4 of this division, means an owner's policy or an operator's policy, or both, of liability insurance, certified as provided in Section 16431 as proof of ability to respond in damages, issued by an insurance carrier authorized to transact such business in this State to or for the benefit of the person named therein as assured. Any requirements set forth in said Chapters 2, 3 and 4 relating to a motor vehicle liability policy shall apply only to those policies which have been certified as proof of ability to respond in damages as provided in Section 16431."

limitations, a permission not voiced by the financial responsibility provisions. Subdivision (d) of the former restated the omnibus "driving with permission" clause which had been the focal point of the *Wildman* decision. Subdivision (e) of the former permitted exclusion of a named driver, a permission not voiced by the financial responsibility law. (Cf. *Abbott* v. *Interinsurance Exchange, supra.*)

▇ Standing alone, section 11580.1 bespeaks an intent to gather to itself all the public policy concerns which had been expressed in *Wildman* and its successors, an intent to stand as the exclusive enumerator of required automobile coverage features *before* an accident. Such an intent would inferably confine Vehicle Code sections 16450-16451 to policies posted as proof of financial responsibility *after* an accident.

Moreover, the Legislature did not leave this statutory objective to the hazards of judicial inference. A 1957 amendment to former section 415 had added a phrase (now appearing in the first sentence of Veh. Code, § 16450, fn. 9, *supra*) designed to confine its demands to those policies certified under the financial responsibility law. (See *American Auto. Ins. Co.* v. *Republic Indem. Co., supra,* 52 Cal.2d at p. 511.) The 1963 amendment now added the last sentence to section 16450 (fn. 9, *supra*), in effect reiterating the confinement of sections 16451 and 16452 to those insurance policies certified to the Department of Motor Vehicles under the financial responsibility law, implicitly but firmly foreclosing their application to voluntary insurance sold on the general market. (See Note, *California Financial Responsibility Law — A Judicial Interpretation* (1969) 20 Hastings L.Rev. 1273; Comment, *The Pacific Case* (1967) 2 U.S.F. Law Rev. 120).

In *Abbott* v. *Interinsurance Exchange, supra,* the court considered the impact of the 1963 legislation and came to the conclusion that Insurance Code section 11580.1 had no effect upon California case law forcibly injecting the demands of Vehicle Code sections 16451-16452 into automobile liability policies. The State Supreme Court denied a petition for hearing in the *Abbott* case. In view of that action, we would believe ourselves bound by *Abbott* had not the Supreme Court recently given indication that the question remains open. (See *Herzog* v. *National American Ins. Co., supra,* 2 Cal.3d at p. 196, fn. 1.)

▇ Aside from statute, an insurance company has the right to limit policy coverage; when it has done so in harmony with the insured's reasonable expectations, the plain language of the limitation must be respected. (See *Continental Cas. Co.* v. *Phoenix Constr. Co., supra,* 46 Cal.2d at p. 432; *Pacific Indem. Co.* v. *Liberty Mut. Ins. Co.* (1969) 269 Cal.App.2d 793, 795-796 [75 Cal.Rptr. 559].) ▇ In assessing the impact of statutory restrictions on that freedom, the judicial function is to ascertain and

fulfill the statutory objective, not to fill omissions. (*Wisdom* v. *Eagle Star Ins. Co., supra,* 211 Cal.App.2d at p. 605.) If Vehicle Code sections 16451-16452 are viewed solely as a set of "second accident" demands, aimed only at policies certified under the financial responsibility law, then Insurance Code section 11580.1 becomes the sole statutory expression of public policy as to automobile policies sold on the general market. It is difficult to conceive of separate public policies imposing different shapes on identical merchandise—one expressed by the Legislature in Insurance Code section 11580.1, the other established by a judicial policy incorporating the demands of Vehicle Code sections 16451-16452.[10]

 In view of Insurance Code section 11580.1, subdivision (b), the St. Paul-Mercury policy held by Wiemken could lawfully limit coverage to vehicles of three-quarter ton capacity and to non-owned temporary substitutes. In view of subdivisions (b) and (c), the State Farm policy held by Rose, Sr., could lawfully exclude non-owned vehicles used in business and non-owned vehicles having more than four wheels. Notwithstanding *Mid-Century Ins. Co.* v. *Hernandez, supra,* and *Abbott* v. *International Exchange, supra,* we have concluded that these policy exclusions were valid; consequently, that neither St. Paul-Mercury nor State Farm has liability for the Alsbury-Faucett judgments.

### ALLSTATE'S LIABILITY FOR BREACH OF DUTY TO DEFEND

Having found that Allstate's refusal to defend Wiemken was "improper and unjustified," the trial court awarded Wiemken damages consisting of a $5,000 attorney fee, litigation costs of $1,025.32 and $2,500 for physical pain and emotional distress. Allstate attacks the award. Repeating its claim that the 1955 Dodge truck was not a temporary substitute automobile, it asserts that it had no coverage, ergo no duty to defend.

Since it did have coverage, the major premise fails. The duty to defend, in any event, does not turn upon the ultimate adjudication of coverage but upon the facts known to the insurer at the inception of the third party's suit against its insured. "An insurer . . . bears a duty to defend its insured whenever it ascertains facts which give rise to the potential of liability under the policy." (*Gray* v. *Zurich Ins. Co.* (1966) 65 Cal.2d 263, 276-277 [54 Cal.Rptr. 104, 419 P.2d 168].)

The Allstate policy undertook to defend Weimken in any lawsuit for dam-

---

[10]By means of a clause conditionally expanding coverage to meet the requirements of the financial responsibility law when and if the policy is certified under that law, a carrier may fashion policy forms simultaneously permitting coverage of selected risks and the broader coverage demanded for proof of financial responsibility.

ages payable under the policy "even if groundless, false or fraudulent." The record shows that by mid-February 1966, Allstate was aware of all the facts which potentially imparted to the Dodge truck the status of a temporary substitute automobile within the policy definition (see fn. 3, *supra*). Allstate also knew that Rose was driving the truck in the course of his employment by Wiemken, its assured. In February 1966 the Alsbury and Faucett actions were filed. Apparently, because of the switch in license plates, the original Alsbury-Faucett complaints erroneously alleged that Rose had been driving the 1955 Chevrolet pickup. During that same month Allstate first sent Wiemken a reservation of right to deny coverage, then an outright disclaimer of all obligation.

Allstate's briefs refer to no policy provision permitting a disclaimer for the illegal switch in license plates. Indignation over its policyholder's disrespect for the law did not exonerate the insurer. For his offense against the Vehicle Code, Wiemken was responsible to the public, not to the insurance company. If the disclaimer was motivated by the switch in license plates, it had an irrelevant basis; if by Allstate's ex parte opinion that the Dodge was not a temporary substitute, the disclaimer ignored known facts creating a potential of coverage. The potential, if not the reality, is demonstrated by the trial court's findings as sustained by this court.

Allstate twice reiterated its disclaimer after tenders of defense by Wiemken's attorney in September 1966 and by State Farm in April 1967. Allstate might have offered to defend, subject to a reservation of its ultimate right to disclaim coverage. (*Gray v. Zurich Ins. Co., supra,* 65 Cal.2d at p. 279.) Alternatively, because the facts upon which its duty pivoted were not issues in the third party tort suits, it might have filed a declaratory relief action to test that duty. (See *Allstate Ins. Co. v. Roberts, supra,* 156 Cal.App.2d 755; *General of America Ins. Co. v. Lilly* (1968) 258 Cal.App.2d 465 [65 Cal. Rptr. 750]; Note, 21 Hastings L.Rev. 191 (1969).) It took neither action but persisted in its refusal to concede any possibility of coverage. The finding of breach of the duty to defend is sustained.

Recognizing that attorney fees and costs are proper items of damage for breach of an insurer's duty to defend, Allstate charges impropriety of the $2,500 award for pain and distress. It does not argue lack of supporting evidence, but seeks to limit the award to breach of contract damages, excluding damage items recoverable in tort.

The theoretical distinction is of no moment at this point because the $2,500 award was proper even under a breach of contract theory. "Whenever the terms of a contract relate to matters which concern directly the comfort, happiness, or personal welfare of one of the parties

. . . he may recover damages for physical suffering . . . caused by its breach." (*Chelini* v. *Nieri* (1948) 32 Cal.2d 480, 482 [196 P.2d 915].) A liability insurance policy is such a contract. (*Crisci* v. *Security Ins. Co.* (1967) 66 Cal.2d 425, 434 [58 Cal.Rptr. 13, 426 P.2d 173].)

Wiemken urges Allstate's liability for the entire $110,000 Faucett judgment, despite the policy limit of $100,000 for the death or injury of any one person. The asserted liability for the excess $10,000 is grounded upon Allstate's breach of its duty to defend.

■ Generally, an insurer's breach of its duty to defend subjects it to liability for the judgment against its insured, as well as the latter's litigation expenses. (*Gray* v. *Zurich Ins. Co., supra,* 65 Cal.2d at pp. 269-280; *Arenson* v. *National Auto. & Cas. Ins. Co.* (1955) 45 Cal.2d 81, 84 [286 P.2d 816].) No California case holds the insurer to liability for the amount of the judgment exceeding the policy limit where its only wrong is breach of the duty to defend. Decisional law in other states justifies the generalization that an insurer guilty of no more than a violation of its covenant to defend is liable only up to the policy limit. (See cases collected § 11 of annotation, 49 A.L.R.2d 694, 720.) ■ Where the company's unjustified denial of coverage motivates both a refusal to defend and the rejection of a reasonable offer to settle within the policy limit, the conjunction of these wrongs may expose it to payment of the excess. (*Comurale* v. *Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 659 [328 P.2d 198, 68 A.L.R.2d 883]; *Seward* v. *State Farm etc. Ins. Co.* (5th Cir. 1968) 392 F.2d 723; *Dairyland Ins. Co.* v. *Hawkins* (S.D. Iowa 1968) 292 F.Supp. 947, 952; *Myers* v. *Farm Bureau Mut. Ins. Co.* (1968) 14 Mich.App. 277 [165 N.W.2d 308, 309]; *Landie* v. *Century Indem. Co.* (Mo. 1965) 390 S.W.2d 558, 559.)

Resort to the appropriate rule of damages for the breach is more vital than the policy's ceiling on indemnity. ■ Whether the theory of recovery is breach of contract or tort, damages are limited to those proximately caused by their wrong. (Civ. Code, §§ 3300, 3333.) Refusal to defend is somewhat analogous to wrongful refusal to settle, although the latter may or may not include a denial of coverage. The "refusal to settle" cases permit the plaintiff to elect between tort and contract recovery. (*Crisci* v. *Security Ins. Co., supra,* 66 Cal.2d at pp. 432, 434; *Comunale* v. *Traders & General Ins. Co., supra,* 50 Cal.2d at p. 663.) In relation to a combined refusal to defend and refusal to settle, the *Comunale* opinion (50 Cal.2d at p. 660) declares: "An insurer who denies coverage does so at its own risk, and, although its position may not have been entirely groundless, if the denial is found to be wrongful it is liable for the full amount which will compensate the insured for all the detriment caused by the insurer's breach of the express and implied obligations of the contract."

Thus far, California decisions dealing with refusal to defend tend to conceptualize it as a breach of contract rather than a tort. (*Gray* v. *Zurich Ins. Co., supra,* 65 Cal.2d at p. 280; *Tomerlin* v. *Canadian Indem. Co.* (1964) 61 Cal.2d 638, 649-650 [39 Cal.Rptr. 731, 394 P.2d 571].) The theoretical distinction between contract and tort recovery may be significant in passing upon some varieties of damage. The point here is that the damages, whether within or above the policy limit, must proximately result from the breach.

A dictum in *Comunale,* 50 Cal.2d at pages 659-660, describes the reason why breach of a duty to defend does not ordinarily result in liability for the excess: "Where there is no opportunity to compromise the claim and the only wrongful act of the insurer is the refusal to defend, the liability of the insurer is ordinarily limited to the amount of the policy plus attorneys' fees and costs. (*Mannheimer Bros.* v. *Kansas Casualty & Surety Co.,* 149 Minn. 482 [184 N.W. 189, 191].) In such a case it is reasoned that, if the insured has employed competent counsel to represent him, there is no ground for concluding that the judgment would have been for a lesser sum had the defense been conducted by insurer's counsel, and therefore it cannot be said that the detriment suffered by the insured as the result of a judgment in excess of the policy limits was proximately caused by the insurer's refusal to defend. (Cf. *Lane* v. *Storke,* 10 Cal.App. 347, 350 [101 P. 937].)"

Causal determinations are a function of the fact trier. (*Mosley* v. *Arden Farms Co.* (1945) 26 Cal.2d 213, 219 [157 P.2d 372, 158 A.L.R. 872]; see also, *Better Food Markets, Inc.* v. *American Dist. Tel. Co.* (1953) 40 Cal.2d 179, 183 [253 P.2d 10, 42 A.L.R.2d 580].) Thus the *Comunale* dictum voices what is usually but not invariably true. As we perceive the rule, damages for breach of the duty to defend are not inexorably imprisoned within the policy limit but are measured by the consequences proximately caused by the breach.

In the trial court insurance other than Allstate's seemed available to pay the excess $10,000. Hence the causal relationship between Allstate's refusal to defend and the excess award was not explored or expressed in a finding. Allstate states that at no time did it receive an offer to settle, an assertion not gainsaid by the other parties. If the facts went no farther, they might well fall within the *Comunale* generalization; that is, a fact trier might conclude that Allstate's trial attorneys could not have achieved a better result for the defense, thus that its refusal to defend did not cause the judgment to exceed the policy limit.

The facts go farther. As in the *Comunale* case, the insurer's refusal to defend was followed by a failure to conclude a reasonable settlement within the

policy limits. Here that failure was at the hands of another insurer, State Farm. During the first part of 1967 Mr. Hurley, attorney for Faucett, sent written settlement offers to attorneys representing State Farm. Expressing the view that the claim had a minimum settlement value of $50,000, Mr. Hurley offered to settle at $10,000, "the policy limits." This amount was the maximum coverage afforded by the State Farm homeowner's policy issued to Rose's father. After being informed by State Farm that the total of available coverage might exceed $10,000, Mr. Hurley nevertheless repeated his offer. State Farm then, in January 1967, filed the present declaratory relief action, seeking a declaration of the respective obligations of itself and Allstate. Its attorneys wrote Mr. Hurley stating that the "policy limits" would be offered if the declaratory relief action resulted in a decision of coverage by State Farm. That letter represented the end of the negotiations. The Alsbury-Faucett actions went to trial and resulted in the Faucett judgment of $110,000. In the trial of the present action, the trial court found that State Farm did not act in bad faith in refusing to settle.

Rose had been driving in the course of his employment by Wiemken and with the latter's permission, hence was an additional insured under the Allstate policy. A fact trier might reasonably conclude that Allstate's refusal to defend had triggered an expectable sequence of events, commencing with assumption of the defense by other insurers who had at least as good a claim to noncoverage as Allstate, if not better. Any insurance carrier is handicapped in settlement negotiations after it has accepted a tender of defense subject to a disclaimer of coverage. Because its duty to defend is independent of the ultimate question of coverage, its consideration of settlement offers is necessarily infused with conflicting loyalties. Thus Allstate would have faced settlement problems resembling those ultimately confronting State Farm. The point of the matter is that made in *Comunale, supra* (50 Cal.2d at p. 660): an insurer denies coverage at its own risk and, although its action may not have been entirely groundless, it is liable for all the detriment caused by its breach. Had Allstate, at the inception of the coverage problem, sought an adjudication of its obligations under the policy, the adjudication would have enabled it to fulfill those obligations, including the implied obligation to give fair consideration to settlement offers. As we know, it did not seek such an adjudication.

That State Farm was not guilty of bad faith in failing to accept the $10,000 settlement offer cannot avail Allstate. Bad faith is not an indispenable ingredient of breach of an insurer's implied covenant of fair dealing. (*Crisci* v. *Security Ins. Co., supra,* 66 Cal.2d at p. 430.) It is not significant that the refusal to settle was the act of an insurer other than the company at whom the liability is aimed; or that the policyholder, rather than

an assignee, is here seeking payment of the excess liability. Both the policyholder and the judgment creditor stand before the court; they do not seek payment of the excess as indemnification under the policy; rather, they claim breach of the duty to defend and damages proximately caused by that breach; if, as an expectable result of that breach, there was a failure of reasonable settlement at a sum within the policy limit, followed by a verdict and judgment in excess of the policy limit, a fact finder could reasonably view the excess as a proximate result of the original refusal to defend. One way or another, a $10,000 settlement offer was transformed into a $110,000 judgment—a disaster for a policyholder with $100,000 of coverage.

Although we have been emphatic in explaining the rationale by which Allstate might be found liable for the $10,000 in excess of the policy limit, we do not attempt to anticipate the outcome of the inquiry. The issue has gained importance only as the various sources of indemnity other than Allstate have disappeared. Because other sources seemed available when this case was tried, the attorneys were not oriented to this issue and did not marshal the evidence around it. For this reason and because additional evidence may be available, we do not exercise our appellate fact-finding power but remand the case to the trial court for a limited retrial on this particular issue.

### ORDER

That portion of the judgment declaring the liability of Pacific Indemnity Company is reversed with a direction to enter judgment declaring that company's nonliability for the Alsbury-Faucett judgments. The case is remanded to the trial court for a retrial limited to the issue of Allstate Insurance Company's liability for payment of the $10,000 portion of the Faucett judgment in excess of the $100,000 policy limit. The judgment is otherwise affirmed, except that the trial court may enter a revised form of judgment consistent with the views and directions expressed in this opinion. Allstate shall bear costs on appeal.

Regan, J., and Bray, J.,* concurred.

A petition for a rehearing was denied August 6, 1970, and the petition of appellate Allstate Insurance Co. for a hearing by the Supreme Court was denied September 3, 1970.

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.