[L.A. No. 30376. In Bank. Apr. 24, 1975.]

STATE FARM MUTUAL AUTOMOBILE INSURANCE
COMPANY, Plaintiff and Respondent, v.
GEORGE D. O'BRIEN et al.,
Defendants and Appellants.

**COUNSEL**

James Edward Green for Defendants and Appellants.

Spray, Gould & Bowers, Daniel O. Howard and Edmond D. Wade for Plaintiff and Respondent.

**OPINION**

**McCOMB, J.**—Defendants appeal from a judgment declaring that plaintiff had no duty to defend or indemnify defendant George D. O'Brien under a certain automobile liability insurance policy.

*Facts:* On May 25, 1971, plaintiff issued a policy of automobile liability insurance to defendant George D. O'Brien as the named

insured. O'Brien's wife, Dawn O'Brien, was the registered owner of the described automobile, which was a 1964 Chevrolet. Under the policy, plaintiff was obligated to defend certain lawsuits arising thereunder. The policy further provided that a "Temporary Substitute Automobile" was included in its coverage "while temporarily used as a substitute for the described automobile when withdrawn from normal use because of its breakdown, repair, servicing, loss or destruction."

On September 3, 1971, O'Brien drove the insured car to work, but returned home about 10 minutes before 12 o'clock noon in order to drive his daughter Kathleen to a doctor's office approximately five miles away for a noon appointment. After he reached home, O'Brien discovered that the insured car's gas tank gauge registered empty.[1] Because of this condition of the car, O'Brien borrowed an uninsured 1960 Chevrolet belonging to his daughter Monica, who lived at home with her parents. At the same time, he instructed his wife, who intended to use the 1964 Chevrolet for her own purposes, to have gasoline put into the gas tank.[2]

While driving the 1960 Chevrolet to the doctor's office, O'Brien had a collision with an automobile driven by Max Freedman, who subsequently brought an action against O'Brien. Plaintiff thereafter filed the present action. The trial court ruled in favor of plaintiff, declaring that it had no duty to defend or indemnify O'Brien under the policy.

■ Question: *Was the insured automobile "withdrawn from normal use because of its breakdown, repair, servicing, loss or destruction," as a result of which the uninsured automobile which O'Brien used in its place was a "Temporary Substitute Automobile" within the meaning of the policy?*

*No.* O'Brien elected to use the uninsured automobile rather than the insured automobile only because he did not want to be inconvenienced by having to stop at a gasoline station for refueling or by possibly running out of gasoline before he could drive the car to a gasoline station or to the doctor's office. The insured automobile was not inoperable

---

[1] It was subsequently determined that the gas tank contained half a gallon of gasoline.

[2] There is no evidence that O'Brien's wife actually used the insured car while he was using the 1960 Chevrolet. However, the trial court found, as follows: "On September 3, 1971, and during the period of time within which George D. O'Brien had planned to use the 1960 Chevrolet automobile in order to take his daughter to her doctor's appointment, Dawn O'Brien intended to use the 1964 Chevrolet station wagon for her own purposes. George D. O'Brien instructed his wife to get gasoline for the 1964 Chevrolet while she was using the vehicle for her own purposes."

because it had broken down or was being repaired, it had not been lost or destroyed, and it was not being serviced. Refueling an automobile cannot logically be regarded as "servicing," necessitating that the driver obtain a substitute vehicle to use while the servicing is taking place. In any event, the car had not been turned over to a serviceman for refueling at the time O'Brien decided to use the other car; O'Brien had merely left it at his home, with instructions to his wife, who intended to use it later for a personal errand she planned to perform, to have the gasoline tank filled while she was out with the car.[3]

*Transit Cas. Co.* v. *Giffin*, 41 Cal.App.3d 489 [116 Cal.Rptr. 110], involves a somewhat similar situation. In that case, a truck owner had been using his dump truck on a construction job and driving home with it each day. There was debris from the construction site on the undercarriage of the truck; and, as the owner drove through the city streets, some of the debris was scattered thereon. He was warned by the city authorities that if he continued to drive the truck through the city scattering debris on the streets, legal sanctions would be imposed. He therefore arranged to leave his truck parked on the grounds of a gasoline station near the construction site and to drive home in the car of a friend. He was involved in an automobile accident while driving home in the friend's car. The trial court found that the insured truck had been withdrawn from normal use because of an incapacity; but the Court of Appeal reversed, holding that the evidence was insufficient to support the trial court's findings.

Noting in *Giffin* that the insured had elected to use the borrowed car as a convenience rather than take the affirmative action required to remedy the condition of the truck, the Court of Appeal said: "This preference by Giffin was not sufficient to 'withdraw the vehicle from normal use' due to a stated incapacity, nor to extend policy coverage to include Giffin's use of the Plymouth. To hold otherwise would conflict with the plain meaning of the language in the Temporary Substitute Automobile Clause." (Pp. 494-495 of 41 Cal.App.3d.)

Plaintiff cites two out-of-state decisions, which clearly support its position, *Iowa Mutual Insurance Company* v. *Addy*, 132 Colo. 202 [286 P.2d 622]; and *Ransom* v. *Fidelity and Casualty Co. of New York*, 250 N.C. 60 [108 S.E.2d 22]. In each of these cases, the insured car was "low on

---

[3]He obviously expected that although the gas tank gauge registered empty, there was still enough gasoline left in the tank for his wife to drive to a gasoline station.

gasoline," and the insured therefore borrowed another vehicle.[4] In both cases, it was held that the borrowed vehicle did not constitute a "temporary substitute automobile," because the policy provided that a "temporary substitute automobile" would be covered only when the insured automobile was withdrawn from its customary use because of its breakdown, repair, servicing, loss, or destruction, and the insured car could not be regarded as being serviced simply because it was "low on gasoline."

The judgment is affirmed.

Wright, C. J., Sullivan, J., Clark, J., and Richardson, J., concurred.

**TOBRINER, J.**—I dissent.

In recognition of the disparity in bargaining power between the insurer and the insured, and considering the enormous hardship which results in the event of the denial of insurance coverage, this court has consistently held that any ambiguity in an insurance contract is to be resolved against the insurer. (See, e.g., *Gray v. Zurich Insurance Co.* (1966) 65 Cal.2d 263, 269 [54 Cal.Rptr. 104, 419 P.2d 168]; *Continental Cas. Co.* v. *Phoenix Constr. Co.* (1956) 46 Cal.2d 423, 437 [296 P.2d 801, 57 A.L.R.2d 914].) In response to this grave inequality in bargaining status and the public service obligations of the insurer (see *Barrera v. State Farm Mut. Automobile Ins. Co.* (1969) 71 Cal.2d 659, 669 [79 Cal.Rptr. 106, 456 P.2d 674]), we have held that as a general proposition the insurance contract should be construed in conformity with the reasonable expectations of the injured.

I had supposed these principles well-settled; yet in this case the majority has in substance abandoned them in circumstances in which their application is unmistakably appropriate. Having rejected the plain meaning of the provision at issue, according to which coverage is clearly mandated, the majority go one step farther and deny the existence of even an ambiguity as to coverage. The majority thus ignore the explicit terms of the clause in question and effectively level the constructional safeguards which this court has laboriously built.

The precise issue in this case concerns the meaning of the temporary substitute provision of an insurance policy. The policy provided that a

---

[4]In *Addy,* the insured vehicle additionally had heavy snow chains, which the insured did not want to bother to remove.

"Temporary Substitute Automobile" was included in its coverage "while temporarily used as a substitute for the described automobile when withdrawn from normal use because of its breakdown, repair, servicing, loss or destruction."

In *State Farm Mut. Auto. Ins. Co.* v. *Allstate Ins. Co.* (1970) 9 Cal.App.3d 508 [88 Cal.Rptr. 246], the Court of Appeal accurately characterized the purpose of such a provision as follows: "A clause extending coverage to a substitute automobile is for the insured's benefit; if any construction is necessary, it is to be construed liberally in favor of the insured. Its purpose is not to limit narrowly or defeat coverage, but to make the coverage reasonably definite as to the vehicle normally used, while permitting the insured to continue driving should that vehicle be temporarily out of commission." (P. 518.) In accord: *Allstate Ins. Co.* v. *Roberts* (1958) 156 Cal.App.2d 755, 758 [320 P.2d 90]. The majority inexplicably ignore this interpretation, which we expressly approved in *State Farm Mut. Auto. Ins. Co.* v. *Johnston* (1973) 9 Cal.3d 270, 276 [107 Cal.Rptr. 149, 507 P.2d 1357], and adopt instead a policy of strict construction against the policy holder. In so doing they incorrectly answer both questions present in the case: whether the named vehicle was withdrawn from normal use and whether that withdrawal was for one of the specified purposes.

In construing the temporary substitute clause the threshold issue is whether the named automobile was withdrawn from "normal use."[1] The normal use of the automobile in the circumstances of the instant case would have been to take O'Brien's daughter to her doctor's appointment. Instead, however, and as a result of the reading of the gasoline gauge of the named vehicle showing the tank to be empty, O'Brien used his daughter's car for the trip. O'Brien thus wisely exercised his option to use a temporary substitute rather than risk the certain inconvenience and potential danger of running out of gas on the highway. At the time of the collision, his own car remained unused in the O'Brien driveway. Thus, the named vehicle was undoubtedly "withdrawn from normal use."

---

[1] In order to come within the provision the insured need not demonstrate withdrawal from all use; it is sufficient if the automobile named in the policy be withdrawn from normal use. I would thus interpret the provision as affording coverage for a temporary substitute while the named vehicle is driven to a service station for servicing or repairs, since such transport does not constitute normal use. I would also interpret the policy as providing coverage for a temporary substitute when the named vehicle is driven in the course of its repair or servicing, e.g., "test-driving." We need not reach these issues in the instant case, however, for, despite the gratuitous reference of the majority to the intentions of Mr. and Mrs. O'Brien relative to the use of the named vehicle, that vehicle was in fact withdrawn from all use.

In addition to the requirement that the named vehicle be withdrawn from normal use, the insurance policy provides that the withdrawal must be "because of its *breakdown,* repair, *servicing,* loss or destruction." (Italics added.) In the present case, O'Brien decided not to drive the named vehicle because refueling was required. Since the general intent of the temporary substitute clause is to provide coverage when the named vehicle is concurrently out of commission *(State Farm Mut. Auto. Ins. Co.* v. *Allstate Ins. Co., supra),* an automobile without gasoline falls clearly within its coverage. As anyone who has had the misfortune can testify, an internal combustion engine without fuel is not subject to, or capable of "normal use."

We need not, however, rely upon the general intent of the temporary substitute clause, since the provision specifically includes withdrawal for "servicing," a term which unquestionably comprehends refueling. In the automotive context, servicing is a generic term encompassing the myriad operations routinely performed at a service station. Typically included among these operations are mechanical tests and adjustments, lubrication, change of oil and refueling.[2] As the Court of Appeal declared in this case, "One of these services is obviously refueling of a car."

In defiance, however, of both the general intent and the specific wording of the clause, the majority conclude that none of the enumerated categories includes withdrawal from use because of servicing required by the need to refuel. The majority thus ask us to believe that the furnishing of gasoline, the primary business of the average service station, cannot be construed as even one of its services. I reject this construction as wholly inconsistent with the plain meaning rule, to say nothing of this court's policy of resolving ambiguities in favor of the insured.

The disparity between the majority's aberrant definition of servicing and ordinary usage is further apparent when we consider the interchangeable use of the terms "service station," "gasoline station" and "filling station." Lest there be any doubt, the latter two terms expressly reflect the primacy of refueling among the functions of the service station; their synonymous use with the term "service station" emphasizes the unreasonableness of the majority's denial that refueling is a constituent element of servicing.

---

[2]Webster's defines a service station as "An establishment where *service* may be obtained for automobiles, as *the furnishing of gasoline,* oil, water, air, greasing, and general repairing." (Webster's Internat. Dict. (2d ed. 1957) p. 2288; italics added.)

In this regard I can only wonder what the majority infer from the contemporary development of the "self-service gasoline station." To be consistent with its proposition that servicing does not comprise refueling, I presume that the majority would define a self-service station as one in which the customer performs his own lubrication, wheel alignments and spark plug checks but not refueling. While such service stations might well foster a healthy development of mechanical expertise, it need hardly be said that in common parlance the term "self-service gasoline station" refers to establishments in which the customer's initiative is more modestly limited to refueling his own automobile.

The sole rationale proffered by the majority for its conclusion that refueling is not properly considered within the compass of servicing is that refueling does not "necessitat[e] that the driver obtain a substitute vehicle to use while the servicing is taking place." (*Ante,* p. 99.) The language of the provision itself, however, is silent as to this implied restriction; this court has consistently refused to imply conditions and limitations upon liability which are not stated expressly in the policy.[3]

As we declared nearly 20 years ago in *Continental Cas. Co.* v. *Phoenix Constr. Co., supra,* "If semantically permissible, the contract will be given such construction as will fairly achieve its object of securing indemnity to the insured for the losses to which the insurance relates. [Citation.] If the insurer uses language which is uncertain any reasonable doubt will be resolved against it; if the doubt relates to extent or fact of coverage, whether as to peril insured against [citations], the amount of liability [citations] or the person or persons protected [citations], the language will be understood in its most inclusive sense, for the benefit of the insured." (Pp. 437-438.)

Under this established standard, the policy at issue unquestionably afforded coverage in the instant case. Accordingly, I would reverse the trial court.

Mosk, J., concurred.

---

[3]The majority's reliance upon *Transit Cas. Co.* v. *Giffin* (1974) 41 Cal.App.3d 489 [116 Cal.Rptr. 110] is misplaced. That case concerned a truck which the policyholder parked at a service station as a mere convenience; there was no showing that the truck was withdrawn from normal use for any of the reasons stated in the policy. In the present case, in contrast, the named vehicle was withdrawn from normal use for *servicing,* a withdrawal for which the policy specifically authorized the use of a temporary substitute vehicle.