**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Plaintiff-Appellant,**

v.

**Johnny M. JOHNSON et al., Defendants-Respondents.**

**No. 39584.**

Missouri Court of Appeals, Eastern District, Division 3.

Aug. 14, 1979.

49

Marion F. Wasinger, Wasinger & Par-
ham, Hannibal, for plaintiff-appellant.

Brown & Phillips, Edina, for defendants-respondents.

KELLY, Judge.

This is an action instituted by the appellant, State Farm Mutual Automobile Insurance Company (hereinafter State Farm) for a declaration of its rights and duties under a contract of automobile liability insurance with Johnny M. Johnson and Roberta L. Johnson, his wife. § 527.010 RSMo. 1969; Rule 87.[1]

The declaration sought was whether the automobile being operated by Mrs. Johnson on December 8, 1973, when it came into collision with another automobile was a "Non-owned Automobile" or a "Temporary Substitute Automobile," as those terms are employed in the insurance contract with the Johnsons.

The trial court entered a judgment declaring that the automobile was a "Temporary Substitute Automobile" within the meaning of the contract; that it was not furnished or available for the frequent or regular use of the Johnsons; and that they were afforded liability insurance coverage by the insurance policy aforesaid for the collision of December 8, 1973.

■ Appellant has appealed this judgment and on appeal presents six Points Relied On for review. We conclude that of these six Points only three comply with the requirements of Rule 84.04(d) and therefore we review only those.[2]

Points II and III of appellant's Points Relied On, as we construe them, raise the question whether the trial court erred in submitting special verdict forms to the jury relative to the questions whether the automobile being operated by Mrs. Johnson at the time of the collision was a "Temporary Substitute Automobile" or whether it was a non-owned automobile furnished or available to Mrs. Johnson because under the evidence these questions were matters of law and not matters of fact.

According to the insurance contract a "Non-Owned Automobile" is defined as "an automobile . . . not (1) owned by, (2) registered in the name of, or (3) furnished or available for the frequent or regular use of the named insured, his spouse or any relative of either residing in the same household other than a temporary substitute automobile." A "Temporary Substitute Automobile" is defined as "an automobile not owned by the named insured or his spouse while temporarily used with the permission of the owner as a substitute for the described motor vehicle when withdrawn from normal use because of its breakdown, repair, servicing, loss or destruction."

These same policy provisions have been considered by the Supreme Court of Missouri in *State Farm Mutual Automobile Insurance Company v. Western Casualty and Surety Company et al.,* 477 S.W.2d 421 (banc 1972) and that case sets out certain legal principles relevant to our consideration of the issues herein presented.

According to the Supreme Court this policy is intended basically to provide coverage on the described automobile—here a 1966 Pontiac 4-door automobile—in return for the payment of a premium based upon single car coverage. However, it does contain clauses providing limited additional coverages without the payment of a further premium therefor.

One such additional coverage is the "Temporary Substitute Automobile" defined hereinabove and a second additional coverage is for operation of a "Non-Owned Automobile" when either is being used by the named insured or insureds. This latter is ofttimes referred to as the "drive other cars" provision. Each of these forms of additional coverage is, however, consistent with the basic idea of insuring one automobile for one premium.

---

1. All statutory references are to RSMo.1969 unless otherwise indicated; all references to Rules of the Supreme Court of Missouri are to the Rules in effect at the time of trial, i. e. May 2, 1977.

2. Appellant's Points Relied On we decline to review are set out in an appendix following this opinion.

With respect to the "Temporary Substitute Automobile" provision of the contract, it is only when the car designated in the policy is withdrawn from normal usage by reason of one of the causes specified therein that the insured is afforded the coverage of the policy with respect to any collision which might occur while insured is operating said substitute automobile. When the vehicle qualifies for coverage under this clause of the policy, it becomes an "owned" automobile for insurance purposes.

■ The purpose of this clause is to make the coverage in the policy reasonably definite as to the vehicle the insured intended to normally use, while at the same time permitting the insured to continue to operate another motor vehicle should the particular vehicle described in the policy be temporarily out of commission, and thus enable the insurer to issue a policy upon a rate fair to both the insured and the insurer, rather than one at a prohibitive premium for blanket coverage of any and all vehicles which the insured might own or operate. *Lloyds America v. Ferguson,* 116 F.2d 920, 923[3] (5th Cir. 1941).

■ To bring an automobile other than the motor vehicle described in the policy under this clause, not only must it be shown that the vehicle described in the policy of insurance is in such condition that it is incapable of being driven in any normal use, as by break-down, repair, servicing, loss or destruction, but also that the substitute vehicle is in use for the purposes for which the insured vehicle would be used were it in an operable condition. *Sellers v. Allstate Insurance Company,* 25 Ariz.App. 482, 544 P.2d 699, 702[4] (1976), rev'd on other grounds, 113 Ariz. 419, 555 P.2d 1113 (banc 1976); *Strozewski v. American Family Mutual Insurance Co.,* 46 Wis.2d 123, 174 N.W.2d 550 (1970).

■ The "drive other cars" clause is included in the contract of insurance for the purpose of covering the occasional or incidental use of another car by the insured without the payment of an additional premium, but to exclude from said coverage the habitual use of other motor vehicles so that the risk of the insurance company is increased without the payment of an additional premium charge for said coverage. Annot., 86 A.L.R.2d 937, 940 (1962). In order to limit this additional coverage State Farm provided that this additional coverage would not apply to a non-owned automobile "furnished or available for the frequent or regular use of the named insured * * * other than a temporary substitute automobile."

With these basic principles in view, we proceed to consider the evidence to ascertain whether a submissible case was made on these issues.

■ The verdict of a jury in a declaratory judgment action is the same as the verdict in other civil actions, and the court's action in incorporating the verdict of the jury into its decree does not change the verdict into a finding of the court that we may review as an equity matter. In such circumstances our review is limited to the same matters as it is in other civil jury verdicts, i. e. was there a submissible case made? *Fidelity and Casualty Company of New York v. Western Casualty and Surety Company,* 337 S.W.2d 566, 574 (Mo.App. 1960).

■ In declaratory judgment actions the burden of proof usually rests where it would have rested had a different type of suit been brought and this often depends upon the condition of the pleadings and the character of the issues involved in the case. *M.F.A. Mut. Ins. Co. v. Quinn,* 259 S.W.2d 854, 858[1] (Mo.App.1953). The court in *Quinn* held that where the question for decision was whether an insurance policy issued by the plaintiff was in force at the time of the collision, the burden of proving the existence of a valid contract of insurance was on the defendants in the declaratory action, the named insured, Charles Quinn, Raymond Quinn, the driver of the motor vehicle described in the policy, and the driver and three passengers of the other automobile involved in the collision. On the other hand, where the insurer attempts to avoid coverage by reason of an exclusion

contained in the policy, the burden of proof has been held to be on the insurer. *Michigan Mutual Liability Co. v. Stallings,* 523 S.W.2d 539, 545[5] (Mo.App.1975); *Mission Insurance Company v. Ward et al.,* 487 S.W.2d 449, 451[3] (Mo. banc, 1972); See Borchard, Declaratory Judgments (2d Ed.) pp. 405–409; Annot., 23 A.L.R.2d 1243, 1258 (1952).

■ The parties do not contest the existence of the policy of insurance nor that it was in force and effect on the date of the collision. It is uncontradicted that the automobile described in the contract was not the one being driven by Mrs. Johnson at the time of the collision. Appellant does not attempt to avoid its obligations under the contract by reason of any exclusion; rather, the issues are whether the insurer is required to afford coverage to an automobile not described in the contract by reason of the additional coverage afforded to a second automobile under extended coverage provisions of the policy without the assessment of an additional premium. In these circumstances we conclude that the respondents had the burden of establishing that the Oldsmobile operated by Mrs. Johnson at the time of the collision came within the umbrella of the insurance contract. *M.F.A. Mut. Ins. Co. v. Quinn,* supra. *Hartford Accident and Indemnity Co. v. Shaw,* 273 F.2d 133, 137[4] (8th Cir. 1959).[3]

■ Having established upon whom the burden of proof rests, we may then proceed to ascertain whether a submissible case was made by viewing the evidence in a light most favorable to the defendants, giving them the benefit of any and all reasonable inferences to be drawn from evidence not in conflict with their theory of the case, and we must disregard plaintiff's evidence unless it aids defendants'. *Kaelin v. Nuelle,* 537 S.W.2d 226, 232[6] (Mo.App.1976).

Appellant introduced evidence initially, calling Roberta L. Johnson to the stand as an adverse witness. The balance of appellant's evidence consisted of answers to interrogatories directed to the Johnsons, the deposition of Woodrow Wilson (the owner of the Oldsmobile), the deposition of Arthur Johnson (father of Johnny Johnson and Woodrow Johnson, and Mrs. Johnson's father-in-law); the testimony of Roberta Johnson and Johnny Johnson from a prior trial of this same case;[4] a prior statement of Johnny Johnson of December 18, 1973; portions of a transcript of a tape-recorded statement of a telephone conversation of Johnny Johnson with an agent of the appellant concerning the Oldsmobile;[5] and those portions of the insurance policy relevant to the issues.[6]

Respondents' evidence consisted of the testimony of Johnny M. Johnson and Richard Erwin, Mrs. Johnson's son.

According to the evidence, in September, 1973, Arthur Johnson lived in Downing, Missouri. He was an elderly man, in poor health. He did not own a car; however, he could drive a car and had a driver's license. Sometime in September, 1973, he went to visit his son, Art Johnson, in Summit, Illinois, and a second son, Woodrow, joined them there. Woodrow brought with him a 1966 Oldsmobile which he had no need for, and loaned it to his father for his father's use; he knew that his brother, Johnny, and his sister-in-law, Roberta, had several

---

3. See discussion of this question in Borchard, Declaratory Judgments (2d ed.) pp. 404–409; Annot., 23 A.L.R.2d 1243 (1952).

4. This prior trial of August 23, 1976, culminated in a mistrial when the jury was unable to reach a verdict.

5. This tape was made with the knowledge and consent of Mr. Johnson.

6. We have not considered whether by proceeding first with its evidence appellant thereby assumed the burden of proof, because to do so would have taken us beyond the framework of the legal propositions constructed by the parties to this appeal. Cf.: *New York Life Insurance Co. v. Stoner,* 109 F.2d 874, 876[1] (8th Cir. 1940) (Because plaintiff in this declaratory judgment action assumed the burden of proof it was estopped to deny that it was not required to assume that burden); *Liberty Mutual Insurance Co. v. Sweeney,* 216 F.2d 209, 211[4, 5] (3rd Cir. 1954); and *Pacific Portland Cement Co. v. Food Machinery & Chemical Corp.,* 178 F.2d 541, 547[9, 10] (9th Cir. 1950).

trucks and automobiles of their own. For this reason Woodrow did not expect Johnny and Roberta would use the Oldsmobile frequently or regularly. Woodrow had only one set of keys to the Oldsmobile and these he gave to his father in Summit, Illinois. Woodrow never had any objections to his family using anything he had and he had no objection to other members of the family using the Oldsmobile if necessary, but they were not to use it so much that they would start "peeling the tires off of it." According to Woodrow the car was primarily for his father's use, but Johnny and Roberta could also use it when their vehicles were broken down, or in need of repair, or in case of an emergency.

Arthur and Art towed the Oldsmobile to Downing and it was parked about twenty feet from Arthur's trailer and between sixty to ninety feet from the home of Johnny and Roberta. It was not parked with the cars and trucks owned by Johnny and Roberta. Arthur's trailer was situated on the same lot as Johnny's and Roberta's house. Johnny and Roberta owned this lot.

Between the time the Oldsmobile arrived in Downing and December 7, 1976, Roberta never used the car for her own purposes; it was used by Arthur except on a few occasions when Roberta drove Arthur to a doctor in Kirksville. Arthur retained control of the only set of keys to the Oldsmobile although he admitted that on one occasion he might have left the keys in the Oldsmobile. Arthur bought gas for the Oldsmobile and Johnny had put a little gas in the car, but very little, because it was seldom used.

According to Roberta she understood that she was to use the Oldsmobile only in an emergency or to take her father-in-law to the doctor, or if it were "needed."

According to Johnny, there were some restrictions on his use of the Oldsmobile; he was not to use it except when needed.

Roberta used her Pontiac to take Arthur to a doctor, and it was only when her Pontiac was unavailable or broken down that she used the Oldsmobile for that purpose.

Richard Erwin, Roberta's son, worked for his step-father, Johnny, in the garbage collection business during the early morning hours as a garbage truck driver. He was also employed by McGraw-Edison in Kirksville, Missouri, between 5:00 p. m. and midnight. He and his wife, Sheri Lyn Erwin, resided in Lancaster, Missouri, in December, 1973.

On December 7, 1973, Richard's automobile was inoperable because its transmission was not working. He hitch-hiked from his home in Lancaster to his mother's home in Downing and borrowed the 1966 Pontiac described in the contract of insurance issued by the appellant to Johnny and Roberta Johnson. He had difficulty getting the Pontiac started, but finally did and drove to Lancaster, arriving there at about 9:00 a. m. He picked up his wife at her place of employment and while en route to his home the Pontiac stopped. He raised the hood and discovered that the battery cable leading to the starter was broken into two parts near the starter. While Richard was so engaged Johnny came by in a garbage truck, stopped and helped Richard try to start the Pontiac. They were unsuccessful. Richard thereupon purchased a cable replacement end and, after the car had been towed to his home by a friend, installed the cable replacement during the afternoon. When he again attempted to start the Pontiac it would not start. At about 4:00 p. m. the same afternoon Richard again tried to start the Pontiac but it would not start. Inasmuch as he was due at work in Kirksville at about 5:00 p. m. he left his home for work in another automobile.

Richard returned to his home in Lancaster at about 12:30 or 1:00 o'clock the morning of December 8, 1973. At approximately 2:30 the same morning a friend came to his home and told him that his wife had been injured in an auto accident. He attempted to start the Pontiac to go to the hospital where his wife had been taken, but the Pontiac flooded, so the friend who had advised him of his wife's predicament drove him to the hospital.

Late on the evening of December 7, 1973, at about 11:00 p. m., Roberta and Johnny left their home en route to Lancaster to pick up the Pontiac and return it to Downing so she could use it to go shopping. At that time Roberta believed the Pontiac was operable and could be driven back to Downing although earlier in the day Richard had told her the Pontiac had broken down; she believed he had fixed it so she could drive it home. Because the Pontiac was in Lancaster, Roberta drove Woodrow's Oldsmobile. Johnny rode along as a passenger. After leaving their home in Downing they proceeded to the D & L Bar where they ate some pizza and Roberta may have had "a half beer." They remained in the pizza parlor until shortly after 1:00 a. m., December 8, 1973, when they resumed their trip to Lancaster with Roberta driving the Oldsmobile. Shortly thereafter the Oldsmobile came into collision with another automobile being operated by David E. Beeler, occupied by Richard's wife, Sheri Lyn and daughter, Ellen Marie, and James Owen. Mr. Owen died as a result of injuries sustained in the collision and the other occupants of the Beeler car also sustained injuries and property damages.

■ We conclude that the evidence established as a matter of law that the Oldsmobile being operated by Roberta Johnson on December 8, 1973, when it came into collision with the Beeler automobile was not a "temporary substitute automobile" as that term is used in the automobile policy issued the Johnsons by the appellant because the occasion for the use of the Oldsmobile did not arise out of the "breakdown, repair, servicing, loss or destruction" of the Pontiac. It is uncontradicted that the reason Mrs. Johnson was driving the Oldsmobile in lieu of the Pontiac was because she had permitted her son to borrow the Pontiac for his personal use. The breakdown of the Pontiac while in possession of her son was, at best, incidental. According to the unambiguous terms of the contract coverage is afforded a temporary substitute automobile only when said automobile is being driven as a substitute "for the described motor vehicle when withdrawn from normal use *because* of its breakdown, repair, servicing, loss, or destruction." (emphasis added). State Farm Mut. Auto. Ins. Co. v. Western Cas. & Sur. Co., supra, l. c. 423 (construing an identical provision).

■ The "Temporary Substitute Automobile" extended coverage does not, and is not meant to, apply to those cases when the insured uses a non-owned automobile out of preference or convenience in lieu of the automobile described in the contract of insurance; that coverage comes under the "drive other cars" clause,[7] which we shall consider next.

We hold, therefore, that the trial court erred in submitting this issue to the jury.

With reference to whether the trial court erred in submitting the question whether the Oldsmobile was not afforded coverage under "Non-Owed Automobile" clause of the insurance contract because it was furnished or available for the regular use of the named insureds, his or her spouse, or any relative of either residing in the same household we reach a different conclusion.

■ The test to be applied where this question is in issue was announced in *State Farm Mut. Auto. Ins. Co. v. Western Cas. & Sur. Co.*, supra, l. c. 424, when the court held that each case should be decided on its own facts, and the court should take into consideration the type and length of use, the purpose for which the non-owned automobile was furnished, and any other pertinent facts, including a determination of whether the use and purpose was in harmony with or violative of the objective of the "non-owned automobile" clause.

We hold that under the evidence adduced there was a submissible case made on this question and the trial court did not err in submitting the issue to the jury.

---

7. *State Farm Mutual Auto. Ins. Co. v. O'Brien,* 14 Cal.3d 96, 120 Cal.Rptr. 692, 534 P.2d 388 (banc 1975); *Transit Casualty Company v. Giffin,* 41 Cal.App.3d 489, 116 Cal.Rptr. 110 (1974).

While there were some inconsistencies in the evidence concerning the number of times the Oldsmobile was used by Mrs. Johnson or how frequently she used it, this was, at least, a question of fact for consideration by the jury under proper instructions.

The final issue, and one of first impression in this state, so far as we have been able to ascertain, is whether the trial court erred in failing to give a burden of proof instruction.

■ Respondents contend the Point has not been preserved for review because appellant did not comply with the requirement of Rule 84.04(c) that a party complaining about the giving, refusal or modification of an instruction must set out the instruction in full in the argument portion of the complaining party's brief.

There is no question appellant did not set out the burden of proof instruction it contends the trial court failed to give.

In reply, however, appellant states that it did not intend, by this Point, to have this court rule on the basis of a refused instruction, but rather, on the failure of the trial court to obey its mandated duty to give the modified burden of proof instruction M.A.I. 3.01, appropriate to this case.

We conclude that under these circumstances this paragraph of the Rule is inapplicable to this Point because the instruction was not given, refused, nor modified, and therefore it is unnecessary to set it out in the Point.

In chambers, after conclusion of the evidence, appellant's counsel tendered a burden of proof instruction, M.A.I. 3.01,[8] and it was denied. Counsel for appellant then withdrew his tendered burden of proof instruction, remarked that there had been a discussion as to who had the burden of proof and that he did not agree his client had the burden of proof. The trial court advised him that it was submitting a verdict form and that no burden of proof in-

struction would be submitted, but that the verdict form "encompasses a phrase which is drawn from the stock form of burden of proof." Counsel then inquired if the trial court was submitting a verdict form "that's one where they're unable to form a belief." The trial court then read what ultimately was submitted to the jury as "Verdict No. 3." Counsel then said: "And since there is no burden of proof offered by any of the defendants here and since the Court is enumerating in its special verdict form what the burden is as to this and has announced he is giving that instruction A (M.A.I. 3.01) that has been enumerated burden of proof. (sic)"

Appellant, in its Motion for New Trial, paragraph 15, stated as grounds for a new trial:

"That the Court violated the MAI standards and did not submit the issue to the jury and did not place the affirmative on the defendants when the plaintiff only had to prove that the automobile being driven at the time of the mishap was not the identified automobile on the insurance policy and then require the burden to be on the defendants to prove that the non-owned automobile came within the insurance policy."

In our opinion it is only by way of a very liberal interpretation of paragraph 15 of appellant's motion for new trial that we can glean that the grounds for a new trial therein stated are directed at the failure of the trial court to submit M.A.I. 3.01, or a modified version thereof. However, respondent, aided no doubt by the pre-instruction conference, so understood it and we may assume that the trial court did also. For these reasons we do not hold that the Point raised on appeal is not the same grounds raised in appellant's motion for new trial.

■ A declaratory judgment action brought under Ch. 527 and Rule 87.01 is a civil action as that term is used in Rule

---

8. The burden of proof instruction tendered, refused, and then withdrawn, MAI 3.01, placed the burden on the plaintiff "to cause you to

believe the propositions necessary to support its claim against defendant."

42.01 because it involves private rights and duties, *State v. Harold*, 364 Mo. 1052, 271 S.W.2d 527[8] (1954); 1 C.J.S. Actions § 43, p. 1096; and therefore the conventional rules of civil practice and procedure apply in the absence of provisions to the contrary. *Campbell v. Shell*, 289 Ala. 115, 266 So.2d 272, 275[2] (1972); *DeVore v. Mutual of Omaha Ins. Co.*, 32 Ohio App.2d 36, 288 N.E.2d 202, 203[1] (1972); *Condenser Service & Engineering Co. v. American Mut. Liab. Ins. Co.*, 45 N.J.Super. 31, 131 A.2d 409, 410[1] (1957); *Mackay v. Whitaker*, 116 Cal.App.2d 504, 253 P.2d 1021, 1025[6] (1953).

 Missouri has established no special rules of practice or procedure for declaratory judgment actions and therefore, unless the fact that the trial court submitted the fact issues to the jury by special verdict negates the mandate that the burden of proof instruction—M.A.I. 3.01—be given in every case, we must hold that error was committed and ascertain whether appellant was prejudiced thereby. *Arnel v. Roettgen*, 530 S.W.2d 20, 23[7] (Mo.App. 1975).

Respondent relies on *Crollard v. Northern Life Insurance Company*, 240 Mo.App. 355, 200 S.W.2d 375 (1947) for the proposition that "the rule in Missouri . . . is that the instructions in a declaratory judgment action need only to submit the essential facts for the court's later determination of the rights of the parties," and concludes that this case will be the first one to decide what type of instruction is properly submitted to a jury under the Missouri Declaratory Judgment Act.

The court in *Crollard* concluded that a proceeding for a· declaratory judgment under our statutes is sui generis and is not of itself strictly either legal or equitable, although its historical affinity is equitable. 200 S.W.2d l. c. 382[8]. It also held that the verdict rendered by a jury on an issue of fact submitted pursuant to the authority of the statutory predecessors of § 527.090 and Rule 87.06 (§ 1134 RSMo. 1939 and 1943 Mo. Laws, Code for Civil Procedure, § 108, p. 386) was a special verdict because under the

Declaratory Judgment Act the determination of the remaining issues, "namely the rights, status and other legal relationship of the parties under the determined facts is for the court." 200 S.W.2d l. c. 383.

It is clear that the *Crollard* decision is not authority for the refusal of a trial court to give the burden of proof instruction mandated by M.A.I. 3.01. As a matter of fact the trial court in *Crollard* did instruct the jury that the burden was on the insurer to prove that the insured died under conditions which made his death a risk not assumed by the policy. The court also had submitted a verdict director instruction in the usual form for the plaintiff but limited the verdict forms to a finding on that issue in favor of the plaintiff or the defendant, leaving for later determination by the court alone the declaration of the rights of the plaintiff and the defendant under the terms of the insurance policy.

The fact issue for jury determination in *Crollard* was whether the insured was intoxicated at the time he sustained the injuries which caused his death. After the instructions had been approved by the court and were ready to be read to the jury, the defendant insurer orally requested the court to submit four specific questions of fact to the jury, but when it was ascertained that the requested questions had not been prepared for submission by counsel for the insurer, the court refused to submit the specific questions requested. Appellant raised the refusal of the court to submit the specific questions so requested in its motion for new trial and in the appellate court. This action of the trial court was upheld because a jury determination of all of the issues of fact had been awarded the defendant under instructions of the court—including the burden of proof—which submitted all the essential facts necessary for the court's later determination of the liability of the defendant under the policy, and for declaration of the rights of the plaintiff thereunder, the appellate court noting that interrogatories are not required under the Missouri Declaratory Judgment Act as they are by subsection (3) of the Federal Declar-

atory Judgment Act, Jud.Code, § 274d(3) 28 U.S.C.A. § 400(3) (current version at 28 U.S.C. § 2201 (1959).

There is no Missouri decision, of which we are aware, that has considered the question whether it is error to omit a burden of proof instruction where special verdict practice is followed.

The special verdict in Missouri is authorized by Rule 71.01 in any proceeding where there is no issue for the recovery of money only, or specific real or personal property. Rule 71.02. It has not been widely employed despite its availability in Missouri since at least 1849 when it was enacted as Mo.Laws 1849, p. 89, Art. XIV. However, use of the special verdict so authorized soon became so hedged about by restrictions and technicalities occasioned by interpreting it against a common law background that it became almost useless as a method of procedure.[9]

We have found no Missouri decision stating the purpose of the special verdict under Rule 71.01. According to the Supreme Court of Minnesota its purpose under a Rule similar to the Federal Rule of Civil Procedure 49(a) is to enable the jury, free from bias, prejudice and sympathy, to make findings of fact without regard to the effect of their findings on the ultimate outcome of the case. *Johnson v. O'Brien*, 258 Minn. 502, 105 N.W.2d 244, 248[3, 4] (1960).

According to one federal jurist who has had considerable experience with special verdict practice under F.R.C.P. 49(a) this purpose of the special verdict relieves the trial court issuing the special verdict from any requirement that it instruct the jury as to which party has the burden of proof. He says that the jury, in such cases, "is simply asked to determine whether, by the greater weight of the evidence, it appears that certain facts are true" because it is the better practice to point out where the burden lies, not upon whom. Nordbye, Use of Special Verdicts under Rules of Civil Procedure, 2 F.R.D. 138, 139 (1941).

However, Professor Charles Alan Wright, the author of the Wright edition of Barron & Holtzoff, Federal Practice and Procedure, (1958–1961) recognized that the form of the court's instructions and the details of the procedure where special verdicts are employed, as well as the function of the special verdict, depends upon how one views the role of the jury. He points out that where there is a mixed question of law and fact involved, the trial court must instruct the jury as to the law; that there is also authority that in any case the judge may deliver a general charge and then call for special verdicts; and that there is also authority that it was not error for the trial court to refuse instructions which would have let the jury know the effect of its answers to the special verdicts, together with a considered dictum that it would be error if the trial judge gave the information. Wright, The Use of Special Verdicts in Federal Court, 38 F.R.D. 199, 204 (1966).

However, we seriously question the applicability of cases and legal principles announced by courts with respect to what instructions they may or may not give in cases where special verdicts are authorized by F.R.C.P. 49(a) or other state statutes or rules similar thereto, because our Rule is dissimilar.

While F.R.C.P. 49(a) directs that "the Court shall give to the jury such explanation and instruction concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon each issue" a dichotomy has developed around instructions given and refused which we would do well to avoid.

As Professor Wright pointed out, 38 F.R.D., l. c. 205: "The courts which have held or said that the jury must be blindfolded as to the effect of its answer have relied heavily on precedents from Texas and Wisconsin, two states in which special verdict practice is very highly developed and where this rule as to instructions is clearly established." However, he further points out that the precedential value of cases from the courts of these two states is lessened because under their special verdict practice special verdicts are mandatory at the request of either party.

---

9. Stinson, Special Verdicts and Interrogatories, 7 Mo.L.Rev. 142, 146 (1942).

Missouri has not adopted F.R.C.P. 49(a). In 1942, however, when there was a proposed General Code of Civil Procedure for the state under study the Supreme Court proposed it as one of two alternatives. The other alternative was that provided by §§ 1120 and 1121 RSMo. 1939 (the same as the present Rule 71.01). Missouri refused to adopt the Federal Special Verdict Rule at that time and has not seen fit to do so in the interim.

Our Rule 71.01 is very simple, merely providing that the verdict of a jury is either general or special and defining each. Unlike F.R.C.P. 49(a) no reference is made to the giving of instructions in case either verdict is employed. A general verdict only must be used whenever the issue is for the recovery of money only, or specific real or personal property, Rule 71.02; but in all other cases the court, at any time during the progress of the cause, may direct an issue or issues to be made for the determination of any fact in controversy when it is of the opinion that the determination of the fact should be made by a jury verdict. Rule 71.03. The court alone may direct the issues to be submitted. Rule 71.04.

In the absence of any reference to instructions in our special verdict Rule we return then to Rule 70.01 and the mandate the Supreme Court enunciated in the Notes on Use to M.A.I. 3.01.

We hold that the trial court erred in failing to comply with the mandate to submit to the jury M.A.I. 3.01 and that we cannot find that said error was non-prejudicial, particularly where, as here, the burden of proof on the issue whether the non-owned Oldsmobile was furnished or available for the frequent or regular use of Roberta Johnson was on the defendants.

Judgment of the trial court is reversed and the cause remanded for further proceedings in accordance with this opinion.

WEIER, C. J., and GUNN, P. J., concur.

APPENDIX

I.

THERE WAS NO ISSUE OF FACT FOR THE JURY. THE COURT ERRED IN SUBMITTING THE CAUSE AND FURTHER IN PERMITTING THE JURY TO DECIDE LAW.

IV.

THE ISSUE OF "SUBSTITUTE" CAR HAD BEEN FINALLY DETERMINED AND THE COURT ERRED IN RELITIGATING THAT ISSUE.

VI.

THE COURT COMMITTED CUMULATIVE TRIAL ERRORS AND THUS DENIED PLAINTIFF A FAIR TRIAL.